**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DARRYL V. CONQUEST, | : | |
| | : | **MEMORANDUM OPINION** |
| Plaintiff, | : | |
| | : | Civil Action No. 07-2125 (MLC) |
| v. | : | |
| | : | |
| GEORGE HAYMAN, et al., | : | |
| | : | |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| WILLIAM STOVALL, | : | |
| | : | Civil Action No. 07-3062 (MLC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GEORGE HAYMAN, et al., | : | |
| | : | |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| MAJOR G. TILLERY, | : | |
| | : | Civil Action No. 07-2662 (MLC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GEORGE HAYMAN, et al., | : | |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

DARRYL V. CONQUEST, Plaintiff pro se, #58068/SBI # 130874A
New Jersey State Prison, P.O. Box 861
Trenton, New Jersey, New Jersey 08625

WILLIAM STOVALL, Plaintiff pro se, #66145/SBI # 210197A
New Jersey State Prison, P.O. Box 861
Trenton, New Jersey, New Jersey 08625

MAJOR G. TILLERY, Plaintiff pro se, #AM 9786
State Correctional Institution at Pittsburgh, P.O. Box 99991
Pittsburgh, Pennsylvania 15233

SUSAN MARIE SCOTT, ESQ., OFFICE OF NEW JERSEY ATTORNEY GENERAL
R.J. Hughes Justice Complex, 25 Market Street, P.O. Box 112
Trenton, New Jersey 08625
Counsel for Defendants

**COOPER, District Judge**

Defendants herein move for summary judgment pursuant to
Fed.R.Civ.P. 56. (Docket entry no. 120; see also docket entry no
146, Reply Br.) Plaintiffs have filed briefs, declarations and
exhibits in opposition thereto. (See Docket entry nos. 135, 140
& 142.)[1] This matter is being considered on the papers pursuant
to Fed.R.Civ.P. 78. For the reasons set forth below, Defendants'
motion for summary judgment will be granted, and judgment will be
entered in favor of Defendants and against Plaintiffs on all of
the claims asserted herein.

## I.   BACKGROUND

**A.   Procedural History**

**1.   Darryl V. Conquest**

On or about May 7, 2007, plaintiff Darryl V. Conquest filed
a pro se Complaint seeking relief under 42 U.S.C. § 1983 as to his
continued placement in the Management Control Unit ("MCU") for
more than twelve years at that time. Conquest v. Hayman, et al.,
No. 07-2125 (MLC) (Docket entry no. 1).[2] Conquest named the

---

[1] Plaintiff William Stovall has filed a "motion to dismiss
defendants motion for summary judgment" as his opposition. (See
docket entry nos. 140 & 142.)

[2] Conquest's action was administratively terminated on May
14, 2007, because his application to proceed in forma pauperis
was incomplete and he failed to pay the filing fee. (Docket

following defendants: George Hayman, Commissioner of the New
Jersey Department of Corrections ("NJDOC"); Michelle R. Ricci,
Administrator of the New Jersey State Prison ("NJSP"); Donald Mee,
Assistant Administrator at NJSP and Chairman of the MCU Review
Committee ("MCURC"); Alfred Kandell, Assistant Superintendent at
NJSP and voting member of the MCURC; Captain Ortiz, NJSP custody
representative and voting member of the MCURC; Dr. Dena Farber,
psychologist at NJSP and voting member of the MCURC; and Lt.
Jones, NJSP custody representative and voting member of the MCURC.

Conquest alleged that Defendants conspired to continue his
placement in the NJSP MCU by engaging in only a pretense of
providing him with annual review hearings in 2007, thereby
subjecting him to cruel and unusual punishment in violation of
the Eighth Amendment, and violating his rights to equal
protection and due process as guaranteed under the Fourteenth
Amendment.  Conquest further alleged that the MCURC's April 3,
2007 annual review hearing decision did not comport with the
requirements set forth in N.J.A.C. § 10A:5-2.11.

On October 17, 2007, this Court entered an Opinion and Order
dismissing Conquest's Eighth Amendment claim and Fourteenth

entry no. 2.)  He paid the filing fee in full on May 30, 2007,
and sought to re-open his case by letter request on or about
August 20, 2007.  (Docket entry nos. 4 & 5.)  He moved to re-open
his case on October 4, 2007.  (Docket entry no. 6.)  The case was
re-opened by Opinion and Order entered on October 17, 2007.
(Docket entry nos. 7 and 8.)

Amendment equal protection claim.  However, Conquest's Fourteenth
Amendment due process claim was allowed to proceed.  (Docket
entry nos. 7 and 8.)

On November 27, 2007, Hayman, Jones, Kandell, Mee, Ortiz and
Ricci moved to dismiss Conquest's claims for lack of jurisdiction.
This Court denied the motion on April 18, 2008.  (Docket entry
nos. 16, 25 and 26.)  On April 9, 2008, Farber moved to dismiss
Conquest's claims for lack of jurisdiction, which also was denied
on April 18, 2008.  (Docket entry nos. 23, 25 and 26.)  The Court
then vacated the April 18, 2008 Order on June 30, 2008, and
entered an Amended Opinion and Order denying defendants' separate
motions to dismiss.  (Docket entry nos. 33, 34 and 35.)

Defendants filed an Answer to the Complaint on April 28,
2008.  (Docket entry no. 27.)  On June 27, 2008, Conquest filed a
Supplemental Complaint without leave of Court.  (Docket entry no.
36.)  Thereafter, on August 13, 2008, Conquest sought leave from
the Court to file his Supplemental Complaint.  (Docket entry no.
43.)  Leave was granted by Order entered on September 4, 2008
(Docket entry no. 48), and Conquest filed a Second Supplemental
Complaint on September 16, 2008.  (Docket entry no. 49.)
Defendants filed an Answer on September 29, 2008.  (Docket entry
no. 50.)

On February 3, 2009, defendants requested that this action be
consolidated with two other related actions, Stovall v. Hayman,

et al., No. 07-3062 (MLC), and Tillery v. Hayman, et al., No. 07-
2662 (MLC), for purposes of taking the defendants' depositions.
Consolidation was ordered on February 18, 2009.  On July 14, 2009,
the Court administratively terminated, sua sponte, Stovall v.
Hayman, et al., No. 07-3062 (MLC) and Tillery v. Hayman, et al.,
No. 07-2662 (MLC), and consolidated those two cases with
Conquest's action.  Discovery has since concluded in this matter.
Conquest filed his Pretrial Memorandum on or about July 20, 2010.
(Docket entry no. 122.)

     Defendants now move for summary judgment.  (Docket entry no.
120.)  Conquest filed opposition to Defendants' motion.  (Docket
entry no. 135.)  Defendants then filed a reply brief in support
of their motion.  (Docket entry no. 146.)

     **2.  William Stovall**

     On or about July 3, 2007, plaintiff William Stovall filed a
pro se Complaint seeking relief under 42 U.S.C. § 1983, as to his
continued placement in the MCU.  Stovall v. Hayman, et al., No.
07-3062 (MLC) (Docket entry no. 1).  Stovall named the following
defendants: Hayman; Ricci; Mee; Kandell; Dr. DeFilippo,
psychologist at NJSP and voting member of the MCURC; Sgt. S.
Wilson, NJSP custody representative and voting member of the
MCURC; and Jones.  (Id.)

     Stovall alleged that Defendants conspired to continue his
placement in the NJSP MCU by engaging in only a pretense of

providing him with annual review hearings in 2007, thereby subjecting him to cruel and unusual punishment in violation of the Eighth Amendment, and violating his rights to equal protection and due process as guaranteed under the Fourteenth Amendment.  Stovall further alleged that the MCURC's March 13, 2007 annual review hearing decision did not comport with the requirements set forth in N.J.A.C. § 10A:5-2.11.  (Id.)  On August 22, 2007, this Court entered an Order allowing the claims to proceed.  (Docket entry no. 2.)

On November 27, 2007, Defendants moved to dismiss Stovall's claims for lack of jurisdiction.  This Court denied the motion on May 15, 2008.  (Docket entry nos. 15, 30 and 31.)

On May 22, 2008, defendants Hayman, Ricci, Mee, Kandell and Jones filed an Answer.  (Docket entry no. 32.)  On June 13, 2008, defendants DeFilippo and Wilson filed an Answer.  (Docket entry no. 37.)  Thereafter, on May 21, 2009, Stovall moved to include missing pages 5 and 6 to his Complaint, which was granted on June 10, 2009.  (Docket entry nos. 71 and 79.)  On June 16, 2009, defendants filed an Amended Answer. (Docket entry no. 85.)

As noted supra, Stovall's action eventually was consolidated with two other actions.  Discovery has since concluded in this matter.  Stovall filed his Pretrial Memorandum on or about July 21, 2010.  (Docket entry no. 121.)

Defendants now move for summary judgment.  (Docket entry no. 120.)  Stovall opposed in the form of a motion to dismiss

defendants' motion, with attachments.  (Docket entry nos. 140 &
142.)  Defendants filed a reply brief in support of their motion
for summary judgment.  (Docket entry no. 146.)  Stovall
thereafter filed a Statement of Material Facts in Dispute, a
reply, and exhibits in support of his arguments.  (Docket entry
nos. 147, 150, 153.)

### 3.   Major G. Tillery

On or about June 7, 2007, plaintiff Major G. Tillery filed a
pro se Complaint seeking relief under 42 U.S.C. § 1983, as to his
continued placement in the MCU.  Tillery v. Hayman, et al., No.
07-2662 (MLC) (Docket entry no. 1).[3]  He named the following
defendants: Hayman; Ricci; Mee; Kandell; Farber; and Jones.  (Id.)

Tillery alleged that Defendants conspired to continue his
placement in the NJSP MCU by engaging in only a pretense of
providing him with annual review hearings in 2007, thereby
subjecting him to cruel and unusual punishment in violation of
the Eighth Amendment, and violating his rights to equal
protection and due process as guaranteed under the Fourteenth
Amendment.  Tillery further alleged that the MCURC's April 3,
2007 annual review hearing decision did not comport with the

_____

[3]  Tillery's action was administratively terminated on July
5, 2007, because his application to proceed in forma pauperis was
incomplete.  (Tillery v. Hayman, et al., No. 07-2662 (MLC)
(Docket entry no. 2).)  He submitted his six month prison account
statement in July 2007, and a motion to re-open his case on
August 6, 2007.  (Docket entry nos.  3, 4 & 5.)  The case was re-
opened by Order entered on August 8, 2007. (Docket entry no. 6.)

requirements set forth in N.J.A.C. § 10A:5-2.11.  (Id.)  On
December 21, 2007, this Court entered an Order allowing the
claims to proceed.  (Docket entry no. 7.)

        On April 9, 2008, Defendants moved to dismiss Tillery's
claims for lack of jurisdiction.  This Court denied the motion on
May 28, 2008.  (Docket entry nos. 19, 22 and 23.)  On June 30,
2008, this Court issued an Amended Order denying Defendants'
motion.  (Docket entry nos. 28, 29 and 30.)  On June 5, 2008,
Hayman, Ricci, Mee, Kandell, Farber and Jones filed an Answer.
(Docket entry no. 25.)

        As noted supra, Stovall's action eventually was consolidated
with two other actions.  Discovery has since concluded in this
matter.  Tillery filed his Pretrial Memorandum on or about July
12, 2010.  (Docket entry no. 129.)

        Defendants now move for summary judgment.  (Docket entry no.
120.)  Thereafter, Tillery informed the Court that he had been
transferred to the State Correctional Institution in Dallas,
Pennsylvania, for medical reasons.  (Docket entry no. 139.)
There does not appear to be an opposition filed by Tillery as to
defendants' motion for summary judgment, although Tillery appears
to suggest that he submitted an opposition on August 24, 2010.
(Docket entry no. 141.)  Defendants filed a reply brief in
support of their motion for summary judgment on October 21, 2010.
(Docket entry no. 146.)  On March 21, 2011, Tillery informed the

Court that he again was transferred to the State Correctional
Institution in Pittsburgh, Pennsylvania.  (Docket entry no. 154.)

**B.   Factual Background**

   **1.   Management Control Unit**

   The MCU at NJSP is a close custody unit to which inmates are
assigned if they pose a substantial threat (1) to the safety of
others, (2) of damage to or destruction of property, or (3) of
interrupting the operation of a state correctional facility.
N.J.A.C. §§ 10A:5-1.3, 10A:5-2.5.  An inmate is assigned to the
MCU based upon a determination made by the MCURC.  N.J.A.C. §
10A:5-2.5.  A number of criteria are considered by the MCURC when
making this determination, including, inter alia, (1) the
inmate's disciplinary records, (2) past criminal offenses, (3)
the number and location of past institutionalizations, (4)
reports by professional staff, (5) reports indicating current
involvement in criminal activity in the community or within the
correctional facility, (6) evidence of an attitude indicating an
unwillingness to follow rules and obey orders, (7) inability to
maintain a satisfactory work record as indicated in reports by
work supervisors or frequency of job changes, (8) information
indicating unsatisfactory adjustment to, or performance in,
treatment or rehabilitative programs, and (9) evidence of the
inability or unwillingness to house with other inmates in a
nondisruptive and nondestructive manner.  N.J.A.C. § 10A:5-2.4.

9

A formal review of each inmate placed in MCU must be made every three months by the MCURC.  N.J.A.C. § 10A:5-2.10(a).  At each review hearing, the MCURC "shall again review the information upon which the decision was based to assign the inmate to the MCU."  N.J.A.C. § 10A:5-2.10(e).  An inmate "shall be released from the MCU when, in the opinion of the MCURC, the inmate no longer poses a substantial threat: (1) to the safety of others; (2) of damage to or destruction of property; or (3) of interrupting the secure and/or orderly operation of a State correctional facility."  N.J.A.C. § 10A:5-2.10(f).

The NJDOC also is to conduct a hearing at least once a year to determine whether an inmate's release from MCU would be appropriate.  N.J.A.C. § 10A:5-2.11(a).  At this annual hearing, the inmate has the burden of showing that the inmate should be released from MCU.  Evidence thereof includes (1) participation in required programs, jobs, educational, and recreational programs, (2) compliance with criteria detailed by the MCURC, (3) no participation in certain prohibited acts for a year, and (4) agreement to reaffirm the obligation to adhere to prison rules and regulations for inmate behavior.  N.J.A.C. § 10A:5-2.11(b).

The NJDOC then has the burden of putting forth substantial evidence, "including behavior, correctional facility adjustment, and disciplinary history that the inmate continues to pose an identifiable threat: (1) to the safety of others; (2) of damage

10

to, or destruction of property; or (3) of interrupting the secure and/or orderly operation of a State correctional facility." N.J.A.C. § 10A:5-2.11(c).

## 2.  Conquest

The following facts are taken from Defendants' Statement of Material Facts, and are substantiated by the Declaration of William J. Moliens at Exhibits C, D and E.  (Docket entry nos. 120-2, 120-4 through 9.)  Conquest is incarcerated in the MCU at NJSP.  In June 1976, Conquest began serving a sentence of two consecutive life sentences for two counts of murder and weapons possession.  From 1976 to 1987, Conquest received 43 disciplinary charges, including two counts of assault with a weapon, one count of engaging in a group demonstration, five counts of conduct which disrupts, one count of an attempted offense, one count of destroying government property, four counts of possession of anything not authorized, one count of mutilating clothing issued by the government, two counts of refusing a work or program assignment, thirteen counts of refusing staff orders, one count of an unexcused absence from a work assignment, two counts of using obscene language, one count of lying, six counts of being in an unauthorized area, one count of failure to follow safety/sanitation regulations, one count of failure to comply with written rules, and one count of giving money or anything of value to another inmate, in violation of N.J.A.C. § 10A:4-4.1.

11

In 1984, Conquest was elected the Chairman of the Prisoners
Representative Committee ("PRC") at NJSP, a position which has
influence over the inmate population.  But Conquest exceeded and
abused his responsibilities as Chairman by inciting other inmates
to engage in violent behavior against custody staff.  Conquest
was then assigned to the MCU in September 1984, and released from
MCU in December 1984.  However, Conquest subsequently schemed to
overthrow the PRC by conspiring to murder other members of the
group, resulting in the stabbing of an another inmate.

Thereafter, in October 1987, Conquest was transferred to the
custody of the Florida Department of Corrections via the
Interstate Corrections Compact, where he was incarcerated from
October 1987 to March 1992.  During his incarceration in Florida,
Conquest accumulated eight disciplinary infractions, for which he
spent approximately ten months in administrative segregation.
During this time, Conquest authored a "communique" in which he
described himself as a "New Afrikan political prisoner who
embraces an "armed struggle."  In March 1992, Conquest was
transferred to the Pennsylvania Department of Corrections, where
he was classified as an "extreme security risk."  Investigations
in the 1990s revealed that Conquest continued to correspond and
maintain influence among radical inmate groups at NJSP.

Conquest was returned to NJDOC custody in December 1995, and
assigned to the MCU in January 1996.  Despite being housed in the

12

MCU, he continued to commit disciplinary infractions from May 1996 to December 1998, including possession of anything not authorized, destroying government property and possession of a weapon.

Since Conquest's initial placement in the MCU, the MCURC has conducted regular routine and annual reviews of his MCU placement to determine whether such placement remains appropriate.  During the relevant time period, the MCURC conducted routine reviews of Conquest's MCU assignment on February 23, May 18, August 17, and December 4, 2006, and February 27, May 31, August 30, and November 29, 2007, which Conquest attended.

In rendering those decisions, the MCURC considered documents regarding Conquest's initial MCU placement, his disciplinary reports, program participation, social services reports, medical and psychological interviews, Special Investigation Division reports and housing reports.  The MCURC also considered Conquest's compliance with the revised MCU placement phases.  Conquest was given the opportunity to make a statement on his own behalf. After considering all the documentation, the MCURC determined that Conquest posed a threat to the safety and security of any correctional facility, and therefore, he should remain in the MCU.  During that time, the MCURC also conducted annual reviews of Conquest's MCU assignment on December 4, 2006 and November 29, 2007, which Conquest attended.  In rendering those decisions, the MCURC considered Conquest's participation in required programs,

13

jobs, educational and recreational programs, his compliance with the criteria detailed by the MCURC, his disciplinary history and his agreement to affirm the obligation to adhere to institutional rules and regulations. Conquest was also permitted to make a statement and present evidence on his behalf. After considering all the factors, the MCURC concluded that despite Conquest's program completions and lack of recent disciplinary charges, his history of violence as demonstrated by the reasons for his initial placement in the MCU was cause for concern. Therefore, the MCURC determined that Conquest's assignment to the MCU was appropriate, as he continued to pose a threat to the safety and security of the correctional facility.

Conquest alleges that he received a written Notice of Decision on an Annual Review Hearing from the MCURC on April 3, 2007, but that he did not attend any Annual Review Hearing on that date, nor was he provided the opportunity to produce any evidence or testimony on his behalf. However, the written decision he received on April 3, 2007 was for the annual review hearing held on December 4, 2006, which was not delivered until April 3, 2007. Therefore, Conquest is correct that there was no annual review hearing on April 3, 2007. Rather, his annual review hearing was conducted on December 4, 2006, at which he was present and provided the opportunity to produce evidence or testimony on his behalf.

Conquest does not dispute his criminal history or his substantial prison disciplinary history as set forth by defendants, except to say that he was given a hardship transfer to the Pennsylvania Department of Corrections at his request in March 1991.  (Conquest's Statement of Material Facts at ¶¶ 1-4, Docket entry no. 135.)  Conquest also asserts that he has had a "spotless record" and has been held at the highest release phase status (Phase III) for the past two years.  (Id. at ¶ 5.)

### 3.    Stovall

The following facts are taken from Defendants' Statement of Material Facts, and substantiated by the Declaration of William J. Moliens at Exhibits G, H, I and K.  (Docket entry nos. 120-2, 120-10 through 19.)  Stovall is incarcerated in the MCU at NJSP. He has been assigned to the MCU since 1996.  Stovall is serving a total term of one hundred and five years, with a thirty-one year mandatory minimum term.  Stovall's criminal history is lengthy. On June 30, 1972, he received an eight-year sentence, with a six-year minimum term, for a robbery he committed in November 1971. In March 1973, he received a suspended six-year sentence in Pennsylvania for another robbery he committed in 1971.  On December 4, 1974, he received a ten year sentence, with an eight-year minimum term, for a bank robbery he committed in New Jersey in June 1971.

In April 1976, while on parole, Stovall committed two armed robberies, an assault, and an assault with a deadly weapon all

15

while carrying a deadly weapon in Camden County, New Jersey; he was sentenced on August 1, 1980, to incarceration for fifteen-to-twenty-five years for these crimes.  Id.  In June 1976, he robbed a bank in Philadelphia, Pennsylvania, for which in February 1980, he received a fifteen-year sentence.  In September 1976, Stovall was charged with violating parole and fleeing to avoid prosecution, for which he received forty-one months for the parole violation and flight on January 28, 1977.  In October 1976, Stovall committed robbery in Delaware County, Pennsylvania, and in September 1977 was sentenced to one-to-two years in the Delaware County Jail.

In August 1978, Stovall was convicted in Philadelphia, Pennsylvania of conspiracy.  In March 1979, he received a seven-year sentence, with a three-year minimum term, for escape and one-to-two-years for the Philadelphia conspiracy charge.  In 1980, Stovall escaped from Graterford Prison.  Later, in September 1980, Stovall committed a robbery, an assault while armed, and was in possession of weapons in Burlington County, New Jersey, for which he was incarcerated in Mercer County Detention Center in Mercer County, New Jersey.  On January 13, 1981, Stovall escaped from that facility, having taken a corrections officer hostage and attempting to shoot him in the head.  That same day, he was apprehended and returned to the county correctional facility.

In March 1981, Stovall was sentenced to twenty-five years with an eight-and-a-half-year mandatory minimum term for the

Burlington County offenses and was committed to serve his incarceration in New Jersey. In April 1982, Stovall was found guilty of escape and criminal attempt to commit murder and received an aggregate twenty-five-year sentence with a twelve-year, six-month mandatory minimum term, for his escape from the Mercer County Detention Center.

In 1991, Stovall tried to procure explosives and various other weapons in an attempt to escape from NJSP, for which he was convicted in 1994 of criminal attempt, implements for escape, three counts of weapons/devices prohibited, and four counts of weapons, possession for unlawful purpose and sentenced to an aggregate thirty-year term with a ten-year mandatory minimum term.

Due to his extensive criminal convictions and sentences, Stovall now has one aggregate one-hundred-five-year sentence with a thirty-one-year mandatory minimum term of incarceration. Stovall was initially placed in the MCU in April 1981. He was released three months later.

In February 1986, he was again placed in the MCU. He was then released from the MCU on June 15, 1987, and placed in administrative segregation. In January 1990, Stovall was returned to general population. From May 12, 1990 through April 2, 1991, Stovall was in administrative segregation. He was then returned to general population. From May 8, 1991 to November 7, 1991, Stovall was again placed in administrative segregation at NJSP.

From November 7, 1991 to May 6, 1993, Stovall was placed in administrative segregation at East Jersey State Prison.  In May 1993, Stovall was administratively referred for placement in the MCU at NJSP due to his continuous involvement in escapes, escape attempts, disruptive activities, illegal demonstrations, assault and conspiracies in which people could be harmed.  By that time, Stovall had accumulated twenty-three disciplinary charges, and spent a total of 125 days in detention and served three years in administrative segregation.  Despite Stovall's many assignments to various close custody units, including the MCU, administrative segregation and detention, he failed to profit from those assignments, as shown by his pattern of placement and replacement in close custody.

On May 21, 1993, Stovall was again assigned to the MCU. Since that time, Stovall has continued to receive disciplinary charges, for failure to comply with the rules, assaulting any person and for conduct disrupting the safe and orderly running of the correctional facility.  Throughout his incarceration he has lost a total of 18,383 days of commutation time, with 713.75 days restored to him.

Since Stovall's placement in the MCU, the MCURC has conducted both annual and routine reviews to determine whether the placement remains appropriate.  During the relevant time period, Stovall received routine reviews, which he attended, on January 19, May

4, August 3, and November 8, 2006, and March 6, May 24, July 19, and October 18, 2007.  In rendering those decisions, the MCURC considered documents concerning Stovall's initial MCU placement, his disciplinary reports, program participation, social services reports, medical and psychological interviews, Special Investigation Division reports and housing reports.  The MCURC also considered Stovall's compliance with the revised MCU placement phases.  Stovall was also given the opportunity to make a statement on his own behalf.  After considering all the documentation and evidence, the MCURC determined that Stovall continued to pose a threat to the safety and security of any correctional facility, and should remain in the MCU.

Stovall also received a routine review on January 30, 2007, which he refused to attend.  In his absence, the MCURC considered documents concerning his initial MCU placement, his disciplinary reports, program participation, social services report, medical and psychological interview, Special Investigation Division report and housing report.  The MCURC also considered his compliance with the revised MCU placement phases.  After considering all the documentation, the MCURC determined that Stovall continued to pose a threat to the safety and security of any correctional facility and should remain in the MCU.

On November 8, 2006 and October 18, 2007, Stovall received annual reviews of his MCU assignment, which he attended.  In

rendering these decisions, the MCURC considered his participation in required programs, jobs, educational and recreational programs, his compliance with the criteria detailed by the MCURC, his disciplinary history and his agreement to affirm the obligation to adhere to institutional rules and regulations.  Stovall was also permitted to make a statement and present evidence on his behalf.  After considering all the factors, the MCURC concluded that despite Stovall's program completions and positive housing history, his history of escapes and attempts to obtain automatic weapons and explosives were cause for concern.  The MCURC thus determined to continue Stovall's placement in the MCU because he continued to pose a threat to the safety and security of the correctional facility.

Stovall alleges that Defendants have conspired to continue his MCU placement by engaging in only a pretense of providing him with annual review hearings, thereby denying him due process, as he did not attend a review hearing on March 13, 2007, the date on which he received the MCURC's Notice of Decision on his annual review hearing.  But the written decision he received on March 13, 2007 was for the annual review hearing held on November 8, 2006, which was not delivered until March 13, 2007.  Therefore, Stovall is correct that there was no annual review hearing on March 13, 2007.  Rather, his annual review hearing was conducted on November 8, 2006, at which he was present and provided the opportunity to produce evidence and testimony on his behalf.

The MCURC conducted a formal review of Stovall in February 2007, and decided to continue his placement in MCU in March 2007. Stovall asserts that he thereafter appealed this decision and requested an annual review hearing in a letter to Ricci. Ricci upheld the MCURC decision and noted that Stovall's annual review would be scheduled by MCURC "as soon as possible." Stovall then received written notice of a decision concerning his annual review hearing on April 3, 2007, noting MCURC's decision to continue his placement in MCU after considering, <u>inter alia</u>, Stovall's evidence and testimony "at his Annual Review". However, Stovall asserts that Defendants conducted a "sham" annual review hearing, as he (1) did not attend the annual review, (2) was not aware that it had occurred, and thus (3) did not provide any evidence or testimony as required under N.J.A.C. § 10A:5-2.11(b). (<u>Id.</u>) Stovall also alleges that this annual review was deficient because it was apparently conducted by MCURC, and not the NJDOC, as required by N.J.A.C. § 10A:5-2.11(a). (<u>Id.</u>) Further, Stovall points out that the substance of the written notice of decision of the annual review is the same as a written notice of decision of a routine review conducted in December 2006. (<u>Id.</u>)

In his Material Statements of Fact (docket entry no. 147), Stovall denies having taken a corrections officer hostage during an escape in January 13, 1981, nor was he indicted or convicted for this alleged incident as stated by Defendants. (<u>Id.</u> at ¶

17.)  He also disputes the amount of commutation time lost.  (Id. at 24.)  For the most part, as set forth above, Stovall disputes that the MCURC conducted meaningful reviews.  (Id. at ¶¶ 20-29.)

### 4.  Tillery

The following facts are taken from Defendants' Statement of Material Facts, and substantiated by the Declaration of William J. Moliens at Exhibits L, M, N and P.  (Docket entry nos. 120-2, 120-20 through 26.)  Tillery is incarcerated with the Pennsylvania Department of Corrections.  Tillery was incarcerated in the NJDOC under the Interstate Corrections Compact from June 6, 2005 to March 9, 2010.  Upon his arrival in New Jersey, Tillery was placed in Pre-Hearing MCU at NJSP.  On June 30, 2005, the MCURC determined to assign Tillery to the MCU, where he remained until his transfer back to Pennsylvania Department of Corrections on March 9, 2010.

Tillery is currently serving a life sentence for murder and a concurrent sentence for arson and attempted arson.  He has a lengthy criminal record, including, but not limited to, twenty-nine arrests and fourteen convictions as an adult.  His past adult offenses include: disorderly conduct, burglary, larceny, receiving stolen goods, possession of narcotics, possession of dangerous drugs, violation of the Uniform Firearms Act, larceny, shoplifting, possession of an instrument of crime weapon, possessing a controlled substance, and three counts of carrying a firearm without a license.

Tillery has received a total of twenty-six disciplinary charges from the Pennsylvania Department of Corrections during his current incarceration.  Notably, five of the misconduct charges were assaults on other inmates, and four involved threats to staff members.  He also has accumulated forty-nine inmate "keep separates" due to his criminal associations both before and during his incarceration.  His behavior while incarcerated in Pennsylvania included violent assaults, fighting, threatening correctional staff members with bodily harm and refusing to obey an order.  Included in his disruptive behavior are numerous challenges to procedures, attempted orchestrated assaults against staff and inmates, and organized gambling, in addition to a long history of gang related criminal activities.

Tillery's last significant disciplinary incident while incarcerated with the Pennsylvania Department of Corrections occurred on October 7, 2004, at SCI Huntington.  While in the dining room containing over three hundred inmates, Tillery initiated a fight with another inmate.  The situation erupted into an incident involving multiple combatants.  The incident created a major threat to the security and orderly running of that institution.

A memo from NJDOC Director William F. Plaintier in April 2005 to Chief of Staff Charles Ellis described Tillery's potential for MCU placement at NJSP.  His history of assaultive and threatening

23

behavior against both inmates and staff was noted, along with his
involvement in an elaborate escape attempt during a potential
court appearance.  Also noted was Tillery's alliance with the
"Black Mafia" that gives him a significant power base within the
Pennsylvania Department of Corrections, as well as many
separation issues.  Finally, it was noted that Tillery is non-
compliant with programming recommendations.

On June 30, 2005, the MCURC determined to assign Tillery to
the MCU.  The MCURC based this decision on "Tillery's extensive
number of institutional assignments, disciplinary history, and
unwillingness and inability to house in a General Population
setting."  Since Tillery's initial MCU placement, the MCURC has
conducted both annual and routine reviews to determine whether he
should remain in MCU or return to the prison's general population.

During the relevant time period, Tillery received routine
reviews of his MCU placement on February 23, May 25, August 17,
and December 4, 2006, and February 27, May 31, August 30, and
November 29, 2007.  In rendering those decisions, the MCURC
considered documents concerning Tillery's initial placement in
the MCU, his disciplinary reports, program participation, social
services reports, medical and psychological interviews, Special
Investigation Division reports and housing reports.  The MCURC
also considered Tillery's compliance with the revised MCU
placement phases.  Tillery was also given the opportunity to make

a statement on his own behalf.  After considering all of the documentation and evidence, the MCURC determined that Tillery continued to pose a threat to the safety and security of any correctional facility, and should remain in the MCU.

Tillery also received annual reviews of his MCU placement on December 4, 2006 and November 29, 2007, which he attended.  In rendering those decisions, the MCURC considered Tillery's participation in required programs, jobs, educational and recreational programs, his compliance with the criteria detailed by the MCURC, his disciplinary history and his agreement to affirm the obligation to adhere to institutional rules and regulations.  Tillery was also permitted to make a statement and present evidence on his behalf.

After considering all the factors, the MCURC noted Tillery's intensive disciplinary history while housed with the Pennsylvania Department of Corrections and his assault on another inmate while in the MCU recreation yard.  The MCURC concluded that Tillery's actions and lack of regard for the rules and regulations of the institutions where he has been housed necessitated his continued MCU placement.

Tillery alleges here that Defendants have failed to abide by the New Jersey Administrative Code regulations governing the routine and annual review hearings of his placement in the MCU. Specifically, he alleges that on April 3, 2007, he received a

25

written Notice of Decision on an Annual Review Hearing from the
MCURC, but had not received an annual review on that date nor was
provided the opportunity to produce any evidence or testimony on
his behalf.  But the written decision he received on April 3,
2007 was for the annual review hearing held on December 4, 2006,
which was not delivered until April 3, 2007.  Therefore, Tillery
is correct that there was no annual review hearing on April 3,
2007.  Rather, his annual review hearing was conducted on
December 4, 2006, at which he was present and provided the
opportunity to produce evidence and testimony on his behalf.

## II.  DISCUSSION

### A.  Summary Judgment Standard

The standard for a motion for summary judgment is well-
settled and will be briefly summarized here.  Rule 56 provides
that summary judgment is proper if there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a
matter of law.  Fed.R.Civ.P. 56(a).  To make this determination,
the Court must "view[ ] the record in the light most favorable to
the non-moving party and draw[ ] all inferences in that party's
favor."  United States ex rel. Josenske v. Carlisle HMA, Inc.,
554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William
Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

But "a mere scintilla of evidence," without more, will not
give rise to a genuine dispute for trial.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 249 (1986).  In the face of such

evidence, summary judgment is still appropriate "where the record ... could not lead a rational trier of fact to find for the nonmoving party". Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'" Williams v. Bor. of W. Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant bears the initial responsibility of informing the court of the basis for the motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Then, when a properly supported motion for summary judgment has been made, the adverse party must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 250. The non-movant's burden is rigorous: the non-movant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995).

## B.   Exhaustion of Administrative Remedies

Defendants preliminarily argue that summary judgment should be granted because Plaintiffs failed to exhaust their administrative remedies. Plaintiffs dispute Defendants' claim.

27

Pursuant to 42 U.S.C. § 1997e(a):

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Exhaustion is mandatory. Jones v. Bock, 549 U.S. 199 (2007). Section 1997e(a) requires "proper exhaustion," as the term is used in administrative law. Woodford v. Ngo, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Id. at 90. Compliance with prison grievance procedures is all that is required for proper exhaustion. The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements that define the boundaries of proper exhaustion. Jones v. Bock, 549 U.S. at 218 (holding exhaustion was not per se inadequate simply because individual later sued was not named in grievance, where prison policy did not require prisoner to identify particular responsible party); see Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004) ("prison grievance procedures supply the yardstick" for determining required steps for exhaustion).

Defendants refer to the inmate grievance procedure established by the NJSP in their argument that Plaintiffs failed to exhaust administrative remedies. Under N.J.A.C. § 10A:8-1.1 to -3.6, the NJSP adopted an Inmate Handbook which set forth information about the Inmate Request and Remedy Form System. The

"Inmate Request System & Remedy Form" ("IRSF") is used "to provide a procedure for ... addressing, on a first step basis through the inmate request coordinator, concerns, problems or complaints which may be experienced on a daily basis."  Under ordinary circumstances, the IRSF will be processed within 30 working days.  The Handbook also provides that the prisoner may appeal a staff response to the IRSF.  The appeal must be submitted within 10 days of the date the staff response is returned to the prisoner, must be submitted using the yellow copy of the IRSF returned to the prisoner, must utilize Part 4 of the form (designated for appeals), and may utilize additional paper.  An appeal with a decision rendered completes the process at the institutional level.  This policy was in effect during the period of the events complained of, until, in 2008, the NJDOC adopted a standardized Inmate Handbook for all NJDOC facilities.

The NJDOC procedures essentially mirrored the previous procedures at NJSP, although requests are divided into three categories: a "Routine Inmate Request," an "Interview Request," or an "Administrative Appeal."  However, the NJDOC Handbook also provides:

> All inmates may use the Inmate Remedy System.  You must use this system to help you obtain information and present your issues, concerns or complaints relative to issues or conditions under the jurisdiction of the NJDOC that affect you personally.  This process must be used ... to request an appeal of a decision or finding rendered by correctional facility staff in regard to a "Routine Inmate Request" ... that you have previously presented.

29

There is no administrative appeal beyond the first level of appeal at the correctional institution level.

Defendants rely on <u>Concepcion v. Morton</u>, 306 F.3d 1347 (3d Cir. 2002) in their argument that Plaintiffs were obligated to properly exhaust <u>all</u> available administrative remedies, such as that provided by the administrative remedy systems of NJSP prior to bringing their actions.  Plaintiffs counter that they complied with the exhaustion requirement by appealing from the MCURC's decisions pursuant to N.J.A.C. § 10A:5-2.7(a).  <u>See</u> <u>Bowman v. N.J. Dep't Of Corrs.</u>, No. A-3783-08T3, 2010 WL 2794105 (N.J. App. Div. July 2, 2010).

The New Jersey Administrative Code provides an administrative review process for inmate complaints concerning a MCURC's decision to continue placement in the MCU.  This administrative review process is found at N.J.A.C. § 10A:5-2.7, <u>Appeal of Management Control Unit Review Committee (MCURC) decisions</u>, which states as follows:

> (a) At the time the inmate is provided with the M.C.U.R.C.'s decision, the inmate shall be advised of the opportunity to have the Administrator or designee review the M.C.U.R.C. decision.  The inmate shall have one calendar week to submit a letter of appeal. The Administrator or designee may approve or modify any M.C.U.R.C. decision as deemed appropriate.  The Administrator or designee may also order further hearings where appropriate.
>
> (b) During the Administrator's review, the following factors shall be considered:
> 1. Whether there was compliance with N.J.A.C. 10A:5-2.6;
> 2. Whether the decision of the M.C.U.R.C. was based on substantial evidence; and

3. Whether the decision rendered was appropriate to the inmate's case.

(c) The Administrator's decision shall be forwarded to the inmate in writing within seven business days following receipt of the appeal.

Conquest shows that he complied with N.J.A.C. § 10A:5-2.7 by timely filing a letter-appeal of the MCURC decision on March 9, 2007.  He further states that he has utilized this administrative review process to appeal from the MCURC's decisions for the entire 14 years he has been confined in the MCU.  (Conquest Declaration in Opposition to Defendants' motion for summary judgment, Docket entry no. 135-1 at ¶¶ 12-15.)  Conquest provides copies of three of these letter-appeals and Ricci's responses.  (Id. at ¶ 16, and Exhibits A, B & C.)  The Court observes that these letter-appeals raise the very same claims asserted by Conquest in this action. He also remarks that the Inmate Remedy System Forms are not provided or used for Disciplinary Appeals, such as his appeals from the MCURC's decisions, citing the Declaration of William J. Moliens at Exhibits A and B, submitted by Defendants in support of their summary judgment motion.  (Id. at ¶ 18.)

Stovall also submits similar confirmation that he complied with the exhaustion requirement by filing letter-appeals pursuant to N.J.A.C. § 10A:5-2.7, as well as an NJSP inmate remedy form in April 2007 after Ricci had failed to respond to his March 19, 2007 letter-appeal.  (Stovall Brief, Docket entry no. 140-1 at pp. 10-13; Stovall Declaration, Docket entry no. 140-2 at ¶¶ 29, 30.)

31

Based on Plaintiffs' contentions as set forth above, this Court finds that they have properly exhausted the administrative remedies available to them as to the due process claims asserted herein by following the administrative review process provided under N.J.A.C. § 10A:5-2.7.  Accordingly, the Court will decline to grant Defendants summary judgment based on Plaintiffs' alleged failure to exhaust administrative remedies.

**C.   Eighth Amendment Claim**

Defendants argue that the Eighth Amendment claims asserted by Stovall and Tillery are without merit because they have failed to allege facts, and do not present any evidence, to support an Eighth Amendment claim.  Defendants argue that this Court had dismissed a similar Eighth Amendment claim asserted by Conquest in the October 17, 2007 Opinion entered in <u>Conquest v. Hayman, et al.</u>, No. 07-2125 (MLC)(Docket entry no. 7 at pp. 10-12.)

The Eighth Amendment's prohibition on cruel and unusual punishment imposes on prison officials a duty to provide humane conditions of confinement.  <u>Betts v. New Castle Youth Dev. Ctr.</u>, 621 F.3d 249, 256 (3d Cir. 2010), <u>cert. denied</u>, 2011 WL 196324 (U.S. 2011).  Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.  <u>Id.</u> For an alleged deprivation to rise to the level of an Eighth Amendment violation, it must result in the denial of the minimal civilized measure of life's necessities.  <u>Id.</u>

To state a claim under the Eighth Amendment, an inmate must allege both an objective and a subjective component.  Wilson v. Seiter, 501 U.S. 294, 298 (1991); Counterman v. Warren Cnty. Corr. Fac., 176 Fed.Appx. 234, 238 (3d Cir. 2006).  The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities' ... are sufficiently grave to form the basis of an Eighth Amendment violation."  Helling v. McKinney, 509 U.S. 25, 32 (1993).  This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim.  Hudson v. McMillian, 503 U.S. 1, 9 (1992).

The subjective component requires that the state actor have acted with "deliberate indifference," a state of mind equivalent to a reckless disregard of a known risk of harm.  See Farmer v. Brennan, 511 U.S. 825, 835 (1994).  A plaintiff may satisfy the objective component of a conditions-of-confinement claim if he can show that the conditions alleged, either alone or in combination, deprive him of the minimal civilized measure of life's necessities, such as adequate food, clothing, shelter, sanitation, medical care, and personal safety.  Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992).

Although the Eighth Amendment directs that convicted prisoners not be subjected to cruel and unusual punishment, "the Constitution does not mandate comfortable prisons."  Rhodes v.

33

Chapman, 452 U.S. 337, 349 (1981).  To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society.  Id. at 347.  An inmate may fulfill the subjective element of such a claim by demonstrating that prison officials knew of such substandard conditions and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety."  Ingalls v. Florio, 968 F.Supp. 193, 198 (D.N.J. 1997).

Stovall and Tillery do not state that housing at the MCU deprived them of adequate food, clothing, shelter, sanitation, medical care, and personal safety.  Therefore, they have not asserted valid grounds to support an Eighth Amendment violation, and Defendants are entitled to summary judgment in their favor on those Eighth Amendment claims.

**D.    Equal Protection Claim**

Defendants argue that they are entitled to judgment on the general equal protection claims asserted by Stovall and Tillery because they have not demonstrated that they are part of a suspect class, nor have they alleged disparate treatment.[4]

The Equal Protection Clause of the Fourteenth Amendment states that no State shall "deny to any person within its

---

[4] Defendants also note that this Court had dismissed a similar equal protection claim asserted by Conquest in the October 17, 2007 Opinion entered in Conquest v. Hayman, et al., No. 07-2125 (MLC) (Docket entry no. 7 at pp. 12-13).

jurisdiction the equal protection of the laws," which is a direction that all persons similarly situated should be treated alike.  City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Artway v. Att'y Gen. of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996).  Despite its sweeping language, though, "[t]he Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

But proof of disparate impact alone is not sufficient to succeed on an equal protection claim; a plaintiff also must prove that the defendant intended to discriminate.  Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 242, 244-45 (1976).  Thus, discriminatory intent must be a motivating factor in the decision, but it need not be the sole motivating factor.  Vill. of Arlington Heights, 429 U.S. at 265-66.

The Court finds that Stovall and Tillery fail to articulate an equal protection violation.  They have not alleged that they were singled out for discriminatory treatment different from other similarly situated prisoners in the MCU.  Moreover, inmates are not members of a suspect class.  See Myrie v. Comm'r, N.J. Dep't of Corrs., 267 F.3d 251, 263 (3d Cir. 2001) (noting inmates, as a class, do not constitute a "discrete and insular" minority).

Therefore, this Court concludes that Defendants are entitled to summary judgment on the claims concerning any equal protection violations.

**E.   Due Process Claim**

The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  To analyze a procedural due process claim, the first step is to decide whether the person was deprived of a liberty or property interest protected by due process.  See Fuentes v. Shevin, 407 U.S. 67 (1972).  Only if the answer is yes, is the second step, determining what process is due, necessary.  See Morrissey v. Brewer, 408 U.S. 471 (1972).

Liberty interests protected by the Due Process Clause of the Fourteenth Amendment may arise under that clause itself or be created by mandatory language in state statutes or regulations. See Sandin v. Conner, 515 U.S. 472, 483-484 (1995).  But "the Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." Id. at 478.  "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  Montanye v. Haymes, 427 U.S. 236, 242 (1976); see Vitek v. Jones, 445 U.S.

480, 493 (1980).  Convicted inmates such as Plaintiffs have no
liberty interest arising by force of the Due Process Clause
itself in remaining in the general population.  See Hewitt v.
Helms, 459 U.S. 460, 466-67 & n. 4 (1983); Montanye, 427 U.S. at
242; Torres v. Fauver, 292 F.3d 141, 150 (3d Cir. 2002).

A state may also create a protected liberty interest through
a statute or regulation requiring placement in the general
population under certain circumstances.  See Sandin, 515 U.S. at
483-84.  "[M]andatory language in a state law or regulation can
create a protected liberty interest only if the alleged
deprivation 'imposes atypical and significant hardship on the
inmate in relation to the ordinary incidents of prison life.'"
Torres, 292 F.3d at 151 (quoting Sandin, 515 U.S. 484).  But
"confinement in administrative or punitive segregation will
rarely be sufficient, without more, to establish the kind of
'atypical' deprivation of prison life necessary to implicate a
liberty interest."  Smith v. Mensinger, 293 F.3d 641, 653 (3d
Cir. 2002); see Fraise v. Terhune, 283 F.3d 506, 522-23 (3d Cir.
2002) (New Jersey prisoners have no protected liberty interest in
being free of indefinite segregated confinement in Security
Threat Group Management Unit).  Thus, in general, Plaintiffs'
confinement in MCU does not impose an atypical and a significant
hardship in relation to the ordinary incidents of prison life in
New Jersey, and Plaintiffs have no state-created liberty interest

37

in avoiding such confinement.  See Bowman v. Ricci, No. 07-2610, 2007 WL 2080066, at *2 (D.N.J. July 17, 2007); Lepiscopo v. Harvey, No. 06-3207, 2006 WL 2403903, at *3 (D.N.J. Aug. 18, 2006).

Nevertheless, at some point Plaintiffs' continued placement at the MCU may implicate such interest, as an inmate may not be housed in the MCU indefinitely without the prospect of release. See Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000) (finding "eight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical'" and affected plaintiff's liberty interest).  However, even if a lengthy confinement in a restrictive prison environment amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life," id. at 143-44, that finding does not end the inquiry for purposes of procedural due process.[5]  The question then becomes what process a prison setting requires. Such process must include the prisoner's opportunity to present views to the prison official charged with deciding whether to retain him in such restrictive environment.  See id. at 145-46.

As set forth in this Opinion, supra, at § I.B.1, New Jersey regulations provide for routine reviews every three months and

_____

[5]  None of the Plaintiffs have asserted any facts to suggest that their MCU confinement has been so extremely isolated, or uniquely and significantly different from "routine" prison conditions in the general population at NJSP, such as those conditions of adverse and indefinite segregation found in Shoats. See 213 F.3d at 144.

annual reviews of each inmate assigned to the MCU.  N.J.A.C. §§ 10A:5-2.10, 10A:5-2.11.  Defendants now argue that they are entitled to summary judgment on the due process claim because Plaintiffs received routine and annual review hearings at which they were provided the opportunity to appear and make a statement and present evidence.

As to Conquest, Defendants state that the MCURC conducted routine reviews during the pertinent period, on February 23, May 18, August 17, and December 4, 2006, and February 27, May 31, August 30, and November 29, 2007, which Conquest attended. Defendants also state that the MCURC conducted annual reviews of Conquest's MCU assignment on December 4, 2006 and November 29, 2007, which Conquest attended.  (Defs. Statement of Material Facts, Docket entry no. 120-2, at ¶¶ 27, 32.)  Defendants further state that Conquest's allegation that he did not attend or have an opportunity to produce testimony or evidence on his behalf at an April 3, 2007 annual review hearing is inaccurate because there was no annual review hearing on that date.  Rather, the written Notice of Decision on an Annual Review Hearing from the MCURC that Conquest received on April 3, 2007 related to the annual review hearing that Conquest had on December 4, 2006, which was delivered on April 3, 2007.  (Id. at ¶¶ 37, 38.)

As to Stovall, Defendants state that the MCURC conducted routine reviews during the relevant period, on January 19, May 4,

August 3, and November 8, 2006, and March 6, May 24, July 19, and
October 18, 2007, which Stovall attended.  Stovall also received
a routine review on January 30, 2007, which he refused to attend.
Defendants also state that the MCURC conducted annual reviews of
Stovall's MCU assignment on November 8, 2006 and October 18,
2007, which Stovall attended.  (Defs. Statement of Material
Facts, Docket entry no. 120-2, at ¶¶ 76-88.)  Defendants further
state that Stovall's allegation that he did not attend or have an
opportunity to produce testimony or evidence on his behalf at a
March 13, 2007 annual review hearing is inaccurate because there
was no annual review hearing on that date.  Rather, the written
Notice of Decision on an Annual Review Hearing from the MCURC
that Stovall received on March 13, 2007 related to the annual
review hearing that Stovall had attended on November 8, 2006,
which was delivered on March 13, 2007.  (Id. at ¶¶ 91-93.)

As to Tillery, Defendants state that the MCURC conducted
routine reviews during the relevant period, on February 23, May
25, August 17, and December 4, 2006, and February 27, May 31,
August 30, and November 29, 2007, which Tillery attended.
Defendants also state that the MCURC conducted annual reviews of
Tillery's MCU assignment on December 4, 2006 and November 29,
2007, which Tillery attended.  (Defs. Statement of Material Facts,
Docket entry no. 120-2, at ¶¶ 117-125.)  Defendants further state
that Tillery's allegation that he did not attend or have an

opportunity to produce testimony or evidence on his behalf at a April 3, 2007 annual review hearing is inaccurate because there was no annual review hearing on that date. Rather, the written Notice of Decision on an Annual Review Hearing from the MCURC that Tillery received on April 3, 2007 related to the annual review hearing that Tillery had attended on December 4, 2006, which was delivered on April 3, 2007. (Id. at ¶¶ 127-130.)

Plaintiffs counter that they have received periodic reviews over the years they have been confined in the MCU, but that many of these reviews did not comply with N.J.A.C. §§ 10A:5-2.2, 10A:5-2.10 and 10A:5-2.11. Plaintiffs also contend that many of the reviews, in particular, the annual reviews in 2006, were a sham.

For instance, Stovall shows that he did not have an annual review hearing in 2006 because the purported annual review of November 8, 2006, which written decision he did not receive until March 13, 2007, was actually a replicated MCURC routine review decision that had been conducted on November 8, 2006. Moreover, on November 8, 2006, Kandell allegedly confirmed to Stovall that the hearing was a routine review and not an annual review. This Court also notes that the custody representative for the routine review and annual review, which were purportedly held on the same date, was different. The routine review custody representative was Wilson, and for the annual review Jones signed the report. (See Moliens Decl., Exhibit I, at DOC048, DOC061).

41

Conquest makes a similar argument as to his purported December 4, 2006 annual review hearing, which decision he did not receive until April 3, 2007, four months later. The language in the written decision he received on April 3, 2007, was verbatim from his routine review that was conducted on December 4, 2006. To show that the annual review was not genuine, Conquest points to his 90-day routine review he had on February 27, 2007, from which he appealed on March 9, 2007, complaining that he had not had an annual review. Conquest alleges that Ricci responded to the administrative appeal on March 20, 2007, confirming that Conquest had not had an annual review hearing and that he would be scheduled as soon as possible. (Conquest Br. at 12.) But Conquest has not provided a copy of his administrative appeal or Ricci's response in support of this allegation.

The Court has painstakingly reviewed the thousands of pages of documents provided by the parties in this matter. And while the Court is somewhat troubled by the discrepancies between the annual review and routine reviews as alleged by Plaintiffs above, ultimately, Plaintiffs received the process to which they were due with respect to their continued MCU placement.

The records provided by Defendants show that Plaintiffs received annual reviews and routine reviews as provided by state regulation. There does not appear to be any proscription against having an annual review and 90-day routine review conducted

42

simultaneously.  At worst, the annual review hearing decisions
were received by Plaintiffs months after the hearing date.
However, this did not preclude Plaintiffs from administrative
appeal of those decisions, which they state that they did appeal.[6]

Plaintiffs have also not shown that their MCU placement
reviews did not conform to the requirements under N.J.A.C. §§
10A:5-2.10 and 10A:5-2.11.  The record amply demonstrates that
Plaintiffs were afforded the opportunity to be heard and produce
evidence and testimony at these review hearings regarding their
participation in required programs, jobs, educational and
recreational programs, and their compliance with the rules and
regulations.  The record also shows an abundance of documentation
and substantial evidence regarding Plaintiffs' disciplinary
history, behavior and attitude, program participation, and
correctional facility adjustment that were reviewed as part of
the MCU review process.  See N.J.A.C. §§ 10A:5-2.10 and 10A:5-
2.11.  Thus, the record belies Plaintiffs' assertion that their
continued confinement is based on reviews that are conducted in a
perfunctory fashion.

The record also does not show that the continued confinement
of Conquest and Stovall in the MCU is based solely on their past

---

[6] Notably, Plaintiffs do not provide copies of the relevant
administrative appeals, nor do they indicate that they pursued
direct appeals to the state court, as in Bowman v. N.J. Dep't of
Corrs., No. A-3783-08T3, 2010 WL 2794105 (N.J. App. Div. July 2,
2010).

criminal and disciplinary history without contemporaneous justification.[7]  Plaintiffs were confined to the MCU based on a combination of factors, including their past criminal and institutional disciplinary history, which the MCURC evaluating them regarded as a threat to the security and orderly operation of the prison.  As commented by Ricci, in her deposition of April 20, 2009:

> The MCU decision as written speaks to the evidence that it evaluates, as did the criteria record sheet when an inmate is placed in MCU.
>
> Each of their routine reviews and the annual review should again reiterate the foundation that placed them in MCU as well as what events may have occurred that would warrant continued placement in MCU or a confidential report or document that speaks to an event that warrants continued placement in MCU.

(April 20, 2009 Deposition of Michelle R. Ricci, P118:L5-L13, Docket entry no. 146-2.)

Furthermore, even if this Court were to conclude that the continued placement of Stovall and Conquest in the MCU is based solely on their past criminal and institutional disciplinary history, the process they received herein "would nonetheless pass constitutional muster, because predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court."  Shoats, 213 F.3d at 146.

---

[7]  Tillery has since been released from the MCU at NJSP and is confined at the SCI Pittsburgh in Pittsburgh, Pennsylvania.

44

Accordingly, this Court finds that Plaintiffs' confinement in the MCU has been, in accordance with NJDOC regulations, reviewed as prescribed every 90 days and on an annual basis.  Further, Plaintiffs were given the opportunity to be heard and present their cases for release personally at each review.  The record shows meaningful reviews in compliance with the directives of N.J.A.C. §§ 10A:5-2.10 and 10A:5-2.11, and is supported by evidence sufficient to pass constitutional muster.  Therefore, because Plaintiffs have failed to provide any support, other than supposition and unsubstantiated assumptions, for their contention that the MCU reviews were perfunctory and constitutionally inadequate, the Court finds that Defendants are entitled to summary judgment because the periodic and annual reviews conducted by Defendants "comport with the minimum constitutional standards for due process."  <u>Shoats</u>, 213 F.3d at 147.

**F.    Remaining Issues for Summary Judgment**

Because this Court has determined that Defendants are entitled to summary judgment on all of the claims asserted by Plaintiffs, the Court need not reach the issues of qualified immunity, immunity based on official capacity, and punitive damages as argued by Defendants in their brief for summary judgment, as these issues are rendered moot by the determination that Plaintiffs fail to state claims for relief under the Eighth

Amendment and the Fourteenth Amendment (due process and equal protection claims).

### III.   CONCLUSION

Therefore, for the reasons set forth above, Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Docket entry no. 120) will be granted.  The Court will issue an appropriate order and judgment.

                                                                    __s/Mary L. Cooper__

                                                       **MARY L. COOPER**
                                                   United States District Judge

Dated:    March 31, 2011